JOEL HERBERT SEAVERNS and Others, Copartners, Doing Business under the Name and Style of HENRY W. PEABODY & CO. OF LONDON, Appellants, *v.* ST. LAWRENCE CONDENSED MILK CORPORATION, Respondent.

First Department, January 13, 1922.

**Sales — action by buyer of condensed milk for breach of warranty — contract of warranty determined by seller's modification in acceptance of buyer's offer where no objection made to modification — verdict in favor of plaintiffs as to breach of warranty, supported by evidence — general verdict improper where damages might have been awarded on three possible theories and jury not instructed as to different theories — new trial granted.**

The contract of warranty by the defendant of the quality of condensed milk sold by it to the plaintiffs was governed by the defendant's acceptance in modified form of the plaintiffs' proposal, where the plaintiffs made no objection to the modification, and the court should have so ruled in an action to recover for breach of warranty and should not have left it to the jury to determine as a question of fact whether the plaintiffs' proposal or defendant's acceptance governed as to the warranty.

In an action to recover damages for breach of warranty on the sale of condensed milk by the defendant to the plaintiffs, it appeared that the defendant sold the milk for shipment to England, warranting "against leaks and blowns on arrival at English port;" that plaintiffs purchased the milk for resale in England and resold it before arrival; that the plaintiffs' customer rejected the milk and plaintiffs demanded repayment of the purchase price therefor; that the plaintiffs contended that a special agreement was entered into between the parties, whereby the plaintiffs were authorized to take out the defective cans of milk and tender the balance to their customer, and that in case the customer refused to receive it, then they were at liberty to sell all of the milk for the account of the defendant; that defendant contended that there was a general custom for the adjustment of such claims for breaches of the contract, to the effect that the seller must replace the defective milk or allow the buyer the value thereof.

*Held,* that the verdict in favor of the plaintiffs to the extent that it necessarily found that there was a breach of the defendant's warranty was sustained by the evidence.

Under the evidence adduced at the trial, the jury would have been justified in finding the existence of the special agreement and awarding damages on that theory, or in finding against the plaintiffs on the issue as to the special agreement and in favor of defendant as to the existence of the alleged general custom with respect to adjusting losses arising under such

contracts and awarding damages on that theory, or it would have been justified in finding that neither the special agreement nor the general custom existed and in awarding damages based on the loss of profits which the plaintiffs would have made on the resale of the milk in England and other damages, if any, in handling or storing the rejected goods for the account of the defendant. The general verdict of the jury, therefore, in favor of the plaintiffs was improper in view of the fact that the court did not definitely and clearly instruct the jury on the first two theories on which damages might have been awarded, or with respect to the law applicable to the case, and did not require the jury to make special findings.

If the jury had been properly instructed, or if there had been special findings, or if it had clearly appeared that the jury found adversely to the plaintiffs with respect to the special agreement, and in favor of the defendant concerning the general custom, the recovery might be sustained, for, on the theory that the amount of damages recoverable by the plaintiffs was limited by such general custom, the verdict appears to approximate the amount to which the plaintiffs would be entitled. But under the circumstances the ends of justice require a new trial.

APPEAL by the plaintiffs, Joel Herbert Seaverns and others, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 21st day of July, 1920, upon the verdict of a jury, and also from an order entered in said clerk's office on the 16th day of July, 1920, denying plaintiffs' motion for a new trial made upon the minutes.

*Fraser, Speir & Meyer [Schuyler M. Meyer* of counsel; *John L. Dunn* with him on the brief], for the appellants.

*Felix H. Levy* of counsel [*William W. Lesselbaum* with him on the brief], for the respondent.

LAUGHLIN, J.:

The recovery was for damages for the breach of a warranty on the sale of condensed milk by the defendant to the plaintiffs. The jury rendered a verdict in favor of the plaintiffs for $1,377.80 and interest thereon from July 1, 1918. The plaintiffs appeal on the ground that it is inadequate.

The evidence is ample to sustain the finding that the milk did not arrive at the port of destination in the condition guaranteed by the defendant. Appellants contend that the award of damages by the jury is not in accordance with the

preponderance of the evidence and is grossly inadequate, and that the precise amount of the verdict is not supported by any evidence in the case.   Respondent is unable to present any theory on which the jury, following the evidence, could fix the damages in the precise amount for which they rendered a verdict, but its counsel contends that the amount awarded approximates the amount to which the plaintiffs would be entitled on one view of the evidence, which may have been taken by the jury, and that, therefore, the verdict should be allowed to stand.   Appellants also contend that the jury were neither clearly nor sufficiently instructed with respect to the basis upon which they were to determine the damages, and that since the verdict does not square with any evidence in the case, it must have been predicated on an arbitrary award of the jury on what they deemed fairly approximated justice.

The contract was for the sale of 10,000 cases of condensed milk in tin cans to be shipped to England and consists of a proposal in writing by the plaintiffs' agents, a firm by the same name as that of plaintiffs but engaged in business in New York city, while plaintiffs were engaged in business at London, Eng., under date of October twenty-ninth, and of an acceptance in writing by the defendant on the 31st of October, 1917.   Plaintiffs' proposal called for a guaranty against all swells, leaks and blown tins on arrival in England. The acceptance modified the phraseology of the guaranty by confining it to a guaranty only " against leaks and blowns on arrival at English port."   So far as appears, plaintiffs made no objection to this modification.   The court, therefore, should have ruled that the contract with respect to the guaranty was governed by the defendant's acceptance but, instead of so ruling, left it to the jury to determine as a question of fact whether the proposal or acceptance governed as to the guaranty. That, however, is of no importance now, excepting as showing the manner in which the case was submitted to the jury, for it is evident that the jury did not hold the defendant beyond the guaranty contained in its acceptance, and the appellants do not complain of the error.   The controversy which resulted in the litigation arose over the first shipment of 3,755 cases, for which plaintiffs paid, according to the terms of the contract, on the receipt of the railroad bills of lading for the transporta-

tion of the milk from Potsdam, N. Y., to the port of New York for reshipment by plaintiffs to England. The milk arrived at the port of Liverpool on the 4th of March, 1918, but, doubtless owing to the existence of the war, was not unloaded until March twenty-first. Plaintiffs purchased the milk for resale in England and resold it before it arrived. On the twenty-fifth of March plaintiffs, through their agents in New York, notified the defendant at its place of business in Potsdam by wire that the customer to which they had resold the milk had rejected it; that they claimed damages owing to faulty " processing," and that the first examination showed that ten per cent of the milk was defective, and they asked for instructions and demanded repayment of the purchase price paid and suggested, in substance, that the defendant allow the plaintiffs to handle the milk for its account, and on the same day wrote defendant to like effect. The defendant on the same day wired and wrote the New York agents of the plaintiffs, refusing the demand and insisting that the milk should have arrived in England in marketable condition. On the second of April, plaintiffs' New York agents wrote the defendant that they had received a cable from the plaintiffs to the effect that it was impossible for them to refuse arbitration with their buyer, and also claiming that the cans contained only thirteen and one-half ounces instead of fourteen ounces, as agreed, and on the same day telegraphed the defendant that the trouble with the milk was " excessive blowage," and that their buyer claimed it had not been properly " processed " and also claimed short weight and demanded rejection and damages, and that arbitrators were examining the shipment officially, and requested instructions. On the third of April, defendant answered the letter and telegram, denying plaintiffs' claim but manifesting a willingness to confer with the plaintiffs' New York agents with a view to ascertaining the facts, and stated also that it would endeavor to obtain the facts direct from London through other sources. On the fourth of April, plaintiffs' said agents wrote the defendant stating that they had notified the plaintiffs that the defendant would thus obtain direct information from London, and asserting that defendant was fully aware that all sales in the United Kingdom were " subject to local rules and arbitrations," and that where

the buyer claims the goods are not according to the contract and the seller claims that they are, the whole matter is turned over to arbitrators for adjustment. So far as appears, defendant did not deny knowledge of such custom or requirement, but, as will be seen presently, it attempted to put in issue notice or knowledge that the goods were purchased for a particular sale thereof by plaintiffs. On the sixth of April, defendant wrote the plaintiffs' said agents that it had requested one Muns, who was its broker in New York city and through whom the preliminary negotiations for the contract were conducted, to have all the blown and leaking cans taken out and the balance of the shipment turned over to the plaintiffs' buyer, and that it understood " from Mr. Muns that this has been accomplished;" and on April twenty-seventh again wrote them stating that it had guaranteed to adjust all blown and leaking cans on arrival in England and that in negotiations between representatives of the parties, it was understood that this was the limit of the defendant's liability and that the course agreed to be taken was to remove the defective cans and tender the balance to the plaintiffs' buyer; and that defendant understood that this had not been done, but that arbitration had been carried out on the entire shipment and not on what was left after the removal of the blown and leaking cans. Three days later the plaintiffs' agents replied that during the negotiations referred to, the defendant's president agreed that the defendant was responsible for the loss sustained by the plaintiffs; and that, as the defendant was fully aware, the English arbitration laws prohibited any interference with the goods pending arbitration, and that when the milk arrived abroad, plaintiffs' buyer claimed that it was not a good tender and that there was faulty processing, and that the board of arbitrators had sustained such claims, and that they had cabled plaintiffs to dispose of the milk as soon as possible and transmit the necessary documents covering their claim, which would be presented to the defendant on receipt thereof, and manifested willingness to " go into details " with defendant's president at any time in New York city. On the third of May, defendant answered that it had been agreed during the negotiations that plaintiffs said agents should cable plaintiffs to make the shipment good and to tender it to their buyer,

and that the defendant's liability was limited to " blown and bursted tins " on arrival in England. On May thirteenth, plaintiffs' said agents telegraphed defendant that they had been advised by plaintiffs that Libbys of London, who through Libbys of Chicago defendant had requested to ascertain the facts for it, had cabled a report to Libbys in Chicago which they thought would enable defendant to see its responsibility, and stating that the plaintiffs estimated the loss at from ten to twelve shillings per case, and that the agents were instructing their principals to sell promptly, and asking defendant to wire immediately if it had any other instructions. To that defendant made no reply. On the fifteenth of May, Muns wrote plaintiffs' agents that it was understood during the negotiations that the plaintiffs were to make the shipment good and tender it to their customer " or dispose of it " as they thought best, and that it was agreed that the plaintiffs would separate the good milk from the bad and make a tender to their customer, and that this was also requested by the arbitrators but was not done, and that the fault seemed to lie with plaintiffs in not properly handling the matter. In behalf of the plaintiffs, testimony was given to the effect that during the negotiations it was agreed by the defendant's president that the plaintiffs be instructed by their said agents to make the tender to their buyer good by removing the bad cans and tendering the rest to their customer, " and failing in that to dispose of it at the best possible advantage." The oral testimony in behalf of plaintiffs was controverted, but the jury were warranted in finding that such an agreement was made. There was also testimony to the effect that to make the parcel tendered " whole and sound " meant to tender to the buyer the sound cans only after the removal of " all leaky, blown and bursted cans." Libbys of London, who examined the shipment for defendant, notified it that about 107 of the cases had been examined and about eight per cent were found to be blown, bursted or pierced, and that there was a dispute as to about twenty per cent more being blown, and that the shipment was properly rejected by the plaintiffs' customer, and that the defendant should authorize an immediate sale of the milk to avoid further damages; and the witness who made the examination testified that on an examination of ten per

cent of the cans, he found nine per cent of those examined blown and was in doubt with respect to nine per cent more. The public examiner at Liverpool testified that he made a ten per cent examination the day after the milk was unloaded, and a complete examination at the warehouse later, and found only 2,934 cases sound, 155 cases blown, and 607 cases and nineteen cans with high tops or blown at one end, which indicated that they were commencing to blow; that they are known as blown only when blown at both ends; and that there were 18 cases and three cans short, the cases having been made to appear full by false packing. There is a conflict in the evidence with respect to whether, where a can is bulged or blown only at one end, it is due to rough handling or to the condition of the milk with respect to the quantity of bacteria therein.

There is evidence on the part of the defendant tending to show that if the milk had arrived at an English port before the end of February, 1918, its condition would not have been so altered as to show blown, burst or pierced or leaky cans. There was no agreement with respect to the time the milk was to reach England, and it does not appear, in view of the then existing war conditions, that the plaintiffs were guilty of any negligence in not shipping it in time to arrive sooner than it did, or with respect to the time elapsing after the arrival of the steamer before it was unloaded. On the part of the plaintiffs, it was shown that the changed condition of the milk which would result in the cans being blown or burst depended upon the quantity of bacteria in the milk, and that it was caused thereby; and it is uncontroverted that no test was made to determine the amount of bacteria in the milk before it was shipped. The evidence introduced on the part of the defendant does not meet or overcome the testimony in behalf of the plaintiffs with respect to the effect of too large a quantity of bacteria in the milk.

The total cost of the milk to the plaintiffs, landed in England, if according to the contract, would have been $49,989.64, consisting of the purchase price of $32,292 paid to the defendant, and freight, duty, landing and other charges; and if the sale thereof to their customer had been consummated, they would have realized a profit of $1,601.25. Plain-

tiffs lost the benefit of their sale and were obliged to pay the charges for the examination of the milk, amounting to $2,843.49, which would have been paid by their customer had the sale gone through. They also had to pay interest amounting to $327.39 to their customer on the purchase price paid, which they were obliged to refund. Plaintiffs, acting pursuant to the authority of the defendant to make the best disposition possible of the milk in the event that it was rejected by their customer, sold it at the best price obtainable and received therefor $43,284.06. Defendant's president testified when called as a witness for the plaintiffs that when Muns opened negotiations with him which resulted in this contract, he stated that the plaintiffs " were in a bad way because they had bought milk from somebody else which they had resold and the suppliers had fallen down on their contract," and in effect, were desirous of buying milk for the purpose of fulfilling a contract which they had made for the sale of milk to a customer in England; but when called in behalf of the defendant, he testified that he was not informed that the plaintiffs were purchasing the milk for " any specifically named customer," but that he understood that they were placing this order to take the place of a former similar order placed by them with another who had failed to perform his contract. Muns, however, testified that before he drew the attention of the defendant to plaintiffs' desire to purchase the milk, it had been explained to him by the plaintiffs that they were desirous of making the purchase to fill an order for the sale and delivery of the milk which they had already placed in England. The defendant presented evidence tending to show that there was a general custom for the adjustment of such claims for breaches of the contract to the effect that the seller must replace the defective milk or allow the buyer the *value* thereof.

The jury in rendering a verdict in favor of the plaintiffs necessarily found that there was a breach of the defendant's guaranty; and I think the uncontroverted evidence shows that such was the fact. On that assumption the damages recoverable by the plaintiffs on the evidence adduced on the trial should have been ascertained on one of three theories. The jury would have been warranted in finding that a special

agreement was made for the disposition of the milk by the purchaser, and that under it the plaintiffs were authorized, in the event that their customer would not take any of the milk, which was the case, to sell all of the milk for the account of the defendant. The evidence with respect to that agreement doubtless presented a question of fact, for the defendant's version of it is that it was conditioned upon the plaintiffs. removing the defective cans and tendering the others to their customer which they did not do, but if the jury determined it in favor of the plaintiffs, then the damages should have been ascertained on that theory and manifestly they were not. If the jury found against the plaintiffs on the issue as to the special agreement and in favor of defendant as to the existence of a general custom with respect to adjusting losses arising under such contracts, as claimed by the defendant, then, by virtue of the provisions of section 152 of the Personal Property Law (as added by Laws of 1911, chap. 571), the contract having been made in New York, the general custom would govern and plaintiffs would only have been entitled to recover the value of the milk which it became the duty of the seller to replace and for which under the custom an allowance was to be made. The evidence does not show upon what basis the *value* of such milk was to be determined but evidently on the theory that what is meant is the cost of replacement, the market value of such milk in the London market at or about the time was shown and also the amount realized on a resale of the defective milk. It cannot be said as matter of law that the existence of such a general custom was conclusively established. The trial court left it to the jury to determine as a question of fact whether or not there was such a custom, with instructions that if they found that there was, then plaintiffs were not entitled to recover any damages on account of that part of the milk which was in accordance with the contract. If the jury had been properly instructed on the other points of law, the verdict might be sustained on the ground that the damages awarded are substantially the amount plaintiffs would be entitled to recover on this theory. If the jury found that no special agreement for the disposition of the milk by the defendant was made and also found that there was no general custom in the

trade, such as claimed by the defendant, then plaintiffs were entitled under the general rules of law applicable, to recover the loss of profits which they would have made on the resale of the milk in England, and other damages, if any, in handling or storing the rejected goods for the account of the defendant. The case was submitted to the jury without any direction for special findings, and they rendered only a general verdict. The jury were neither clearly nor definitely instructed on two of the three theories of damages or with respect to the law applicable to the case. In most instances, the court, after stating a proposition of law, left it to the discretion of the jury as to the application of it. If they had been properly instructed, or if there had been special findings, or if it clearly appeared that the jury found adversely to the plaintiffs with respect to the special agreement, and in favor of the defendant concerning the general custom, the recovery might be sustained, for, as already observed, on the theory that the amount of damages recoverable by the plaintiffs was limited by such a general custom, the verdict appears to approximate the amount to which the plaintiffs would be entitled. In the circumstances, we are of opinion that the ends of justice require a new trial.

It follows that the judgment and order should be reversed and a new trial granted, with costs to appellants to abide the event.

CLARKE, P. J., DOWLING, PAGE and MERRELL, JJ., concur.

Judgment and order reversed and new trial ordered, with costs to appellants to abide event.